# THE STATE OF NORTH DAKOTA, Respondent, v. WILLIAM GUMMER, Appellant.

### (200 N. W. 20.)

**Homicide — circumstantial evidence held to sustain conviction of murder in first degree.**

    1. Upon a prosecution for the crime of murder, where the deceased is shown to have been first raped and then murdered, and where the evidence to connect the defendant with the crime, as its perpetrator, is circumstantial, the evidence is reviewed and it is held sufficient to support the verdict of guilty and to exclude every reasonable hypothesis of innocence.

---

Note.—(5) Impeachment of witness by inconsistent statements, see 28 R. C. L. 633; 3 R. C. L. Supp. 1588; 4 R. C. L. Supp. 1833.

    (7) Proof of other crimes in criminal case, see 8 R. C. L. pp. 199, 212; 2 R. C. L. Supp. 573; 4 R. C. L. Supp. 535; 5 R. C. L. Supp. 454.

    (9) Admission of document not otherwise relevant as standard of comparison of handwriting, see annotation in 62 L.R.A. 817; 63 L.R.A. 163; 18 L.R.A. (N.S.) 520; 11 R. C. L. 625.

**Homicide — evidence as to relations of defendant with roommate held admissible.**

2. For reasons stated in the opinion, it is held, that the trial court did not err in receiving certain evidence offered by the state tending to establish the close and intimate friendship and association between defendant and his roommate Brown; that during the night and in the hotel, in which the crime was committed, the defendant had a conversation with Brown; and that Brown thereafter had an opportunity to write and did write a fictitious name upon the hotel register.

**Witnesses — cross-examination of state's witnesses held properly restricted to subject-matter of direct examination.**

3. Where the defendant sought to show upon the cross-examination of said Brown that he did not write the fictitious name upon the hotel register, it is held, for reasons stated in the opinion that the trial court did not err in restricting the cross-examination to the subject-matter of the direct examination.

**Homicide — admission of evidence of whereabouts and appearance of roommate of accused on morning of crime held not erroneous.**

4. For reasons stated in the opinion, it is held that there was no error in the admission of evidence as to the whereabouts and. the appearance of a third party at 6:30 o'clock of the morning when the crime was committed, such third party being a roommate associate of the accused.

**Witnesses — may be impeached by proof of prior inconsistent statements tending to show interest.**

5. A witness may be impeached by proof of inconsistent statements made at a prior time when such inconsistent statements tend to show his interest.

**Witnesses — cross-examination of state's attorney properly limited to happenings prior to conclusion of defendant's admissions to him.**

6. For reasons stated in the opinion, it is held that there was no error committed in limiting the cross-examination of the state's attorney who had testified concerning certain admissions made by the defendant.

**Criminal law — evidence of defendant's participation in criminal acts, or those involving moral turpitude, to establish moral deficiency or criminal disposition generally inadmissible; all circumstances attending commission of crime charged admissible regardless of prejudicial character.**

7. In a criminal case, the prosecution may not introduce evidence tending to prove that the defendant was morally deficient; that he possessed a criminal disposition generally or. that he was particularly disposed to commit the offense with which he is charged, and, to this end, it may not introduce evidence of the defendant's participation in other acts which are criminal or which involve moral turpitude; but it may, nevertheless, prove all the cir-

cumstances attending the commission of the crime in question, and if, in so doing, it is necessary to show an immoral course of conduct pursued by the defendant, the facts going to establish that conduct are admissible regardless of their prejudicial character.

**Criminal law — attitude of accused hotel clerk towards female guests held relevant.**

8. Where, among the circumstances attending the commission of a crime, it appears that a certain relationship existed between the accused and the victim of the crime (that of hotel clerk and guest), and where the prior acts of the accused towards others in that relationship, as shown by his admissions, have been such as to show a general disregard of his obligations in the relationship and to evidence a lascivious course of conduct towards all attractive females who came within that relationship, it is held that testimony and admissions concerning the recent attitude of the accused towards such third persons similarly situated, are relevant to establish the circumstances attending the crime in question.

**Criminal law — specimens of hand writing admissible for comparison, where authorship of certain writing in issue.**

9. Where the authorship of a certain writing is in issue in a criminal case, the party attempting to prove it to be the handwriting of a certain individual may introduce specimens of the handwriting of such person, not otherwise relevant or admissible, for purposes of comparison, where, in the judgment of the trial court, the admission of such specimens will have little, if any, tendency to complicate the issues.

**Admission of evidence — court's ruling in admission of evidence held proper.**

10. Certain rulings of the trial court in the admission of evidence examined and reasons stated in the opinion, held to be proper.

Opinion filed February 16, 1924.   Rehearing denied September 3, 1924.

Criminal Law, 16 C. J. § 1006 p. 534 n. 37; § 1134 p. 588 n. 8; § 1165 p. 600 n. 32; p. 601 n. 37; § 1230 p. 621 n. 72, 76; § 1532 p. 747 n. 47; § 1566 p. 763 n. 32; § 1590 p. 778 n. 96.   Evidence, 22 C. J. § 8 p. 66 n. 17.   Homicide, 30 C. J. § 391 p. 171 n. 56; § 423 p. 193 n. 53, p. 195 n. 61; § 433 p. 205 n. 4; § 542 p. 297 n. 32, p. 298 n. 47.   Witnesses, 40 Cyc. p. 2591 n. 94; p. 2681 n. 40; p. 2687 n. 93; p. 2701 n. 39.

Appeal from the District Court of Barnes County, Honorable *Chas. M. Cooley*, J.

Affirmed.

*Barnett & Richardson,* and *H. W. Swenson,* for appellant.

In order to convict on circumstantial evidence, it is held necessary, not only that the circumstances all concur to show that the prisoner committed the crime, but that they all be inconsistent with any other rational conclusion. · It has always been held in cases of purely circumstantial evidence, that if any of the facts or circumstances established be absolutely inconsistent with the hypothesis of guilt, that that hypothesis cannot be true. The hypotheses of guilt are to be compared with the facts proved, and with all of them. If the circumstances established are dependent, one upon another, each must be consistent only with the theory of guilt in order that a conviction may stand, but if the circumstances are independent, the prevailing view is that weak links in the chain may be strengthened by the stronger ones. If the circumstances, no matter how strong, can be reasonably reconciled with the theory that some other person may have done the act, the defendant should not be convicted, and a verdict of guilty will be set aside as contrary to law. 8 R. C. L. 222.

Under some circumstances, in a conspiracy charge, it is permissible, if the conspiracy has *first* been proven, to prove acts and declarations of the conspirators in the furtherance of the conspiracy, made or done in the absence of the other conspirator. In conspiracy cases, however, this exception to the ordinary rule of hearsay evidence is inoperative until *after* the conspiracy is proven, and such acts or admissions of a co-conspirator are not admissible in the first instance to prove the existence of the conspiracy. Driggers v. United States (Okla.) 95 Pac. 612; State v. Smith, 81 S. W. 936; People v. Kief, 126 N. W. 661.

Furthermore, it is the rule in such cases that no act or declaration of one conspirator, made in the absence of the other, after the conspiracy has been consummated and completed, is admissible against the absent defendant. Fain v. United States, 209 Fed. 525; State v. Nest (Wash.) 118 Pac. 920; Harrington v. United States, 267 Fed. 97.

It is contrary to the first principles of justice to try a man for one crime and convict him of that because he may be guilty of another, or because he may be a low specimen of humanity. State v. Clark (Cal.) 203 Pac. 781.

It is not proper to raise a presumption of guilt on the ground that having committed one crime, the depravity it exhibits makes it likely

that the defendant would commit another crime of the same class, for which he was being tried. State v. O'Donnell, 61 Pac. 892.

When a prisoner is on trial charged with a specific offence, the proof of the commission by him of a distinctly collateral offence, or of any number of collateral offences, is, as a general rule, no proof whatever of the commission of the offence charged. Yet such proof would produce most damaging prejudice in the minds of the jurymen. *A party must not be convicted of a crime upon proof of a criminal disposition, however depraved, or however pronounced.* Nor should a prisoner on trial be expected to be prepared to defend his entire past record. No such demand is made upon him. He is simply required to defend against the specific offence for which he is on trial. State v. Fallon, 52 N. W. 318.

Courts have almost uniformly held that proof of a collateral crime could not be introduced unless there was such a logical connection between such collateral offence and the offence charged, that the proof of the collateral offence furnished some legal evidence tending to establish some fact necessary to be established in proving the crime charged. State v. Miller, 128 N. W. 1034.

It is a general rule in criminal cases, which is well established, that the commission of other similar offences by the defendant cannot be offered in evidence for the purpose of showing that the person charged in the information with a crime *has a criminal tendency,* or is of a *criminal disposition or nature,* in order to show that there was more *likelihood* that he would commit the offence. State v. Rice, 168 N. W. 369.

Proof of an offence other than the one for which the defendant is on trial is prejudicial error. State v. Fulweider, 134 N. W. 807.

Circumstantial evidence is always insufficient to convict a person of crime, where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other reasonable hypothesis which invests mere circumstances with the force of truth; whenever the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof however great the probability may be. Sorrells v. State, 94 So. 209.

In a prosecution for aggravated assault upon a female child by fondling her person, it was reversible error to admit evidence to the effect that defendant at other times had made vulgar remarks, and been guilty of indecent conduct in presence of other female children, in no way connected with the instant offence, nor relevant under exceptions to the general rule which excludes evidence of that character. Vana v. State (Tex.) 246 S. W. 1034; Comm. v. Haines (Pa.) 101 Atl. 641; Comm. v. Gibson (Pa.) 119 Atl. 403; Thompson v. U. S. (N. J. C. C. A.) 283 Fed. 895.

Evidence of other crimes have probative force. It affects the judgment of the average juror, and of the trained legal mind of the lawyer, and of the judge accustomed to scrutinize and weigh evidence. State v. Friend, 186 N. W. 241.

George Shafer, Attorney General, H. F. Horner, State's Attorney, V. R. Lovell, Assistant State's Attorney, C. C. Watlam, and Wm. C. Green, of counsel for state, for respondent.

From these and other reflections we have come to the conclusion that it is a mistake to say that circumstantial evidence is inferior to what is commonly called "positive and direct testimony." The truth is that no human testimony is superior to doubt, even in cases of the most direct proof. It is always possible that witnesses may err unintentionally, or may corruptly falsify their testimony for reasons which are at the time not apparent and not known. If the law required mathematical certainty either as to matters of fact or as to the conclusions drawn by the courts and juries, the enforcement of law would be impossible. Ex parte Jefferies, 7 Okla. Crim. Rep. 544, 41 L.R.A.(N.S.) 749, 124 Pac. 924; Coleman v. State, 6 Okla. Crim. Rep. 252, 118 Pac. 594.

Irrelevant papers are not admissible in evidence for the purpose of furnishing a standard of comparison but to this rule exceptions are made in those cases where papers offered are conceded by the opposite party to be genuine, or as such as he is estopped to deny, or where for other reasons no collateral issues can be raised by their introduction. Cochran v. National Elevator Co, 20 N. D. 178.

It is not a violation of the rule of evidence requiring the production of the best evidence obtainable, to permit proof of handwriting by witnesses without calling for the testimony of the writer, although the

latter may be within the jurisdiction of the court. 15 Am. & Eng. Enc. Law, 2d ed. p. 254; Lefferts v. State, 49 N. J. L. 26, 6 Atl. 521.

. This court has repeatedly held that the scope of cross-examination is largely committed to the sound discretion of the trial court. State v. Tolley, 23 N. D. 285, 291, 136 N. W. 784.

And ordinarily this court will not interfere unless its exercises result in manifest prejudice. State v. Foster, 14 N. D. 561, 567, 105 N. W. 938; State v. Longstreth, 19 N. D. 268, 276, 121 N. W. 1114, Ann. Cas. 1912D, 1317; State v. Mozinski, 191 N. W. 346.

It is generally agreed that it is improper for a party during the cross examination of a witness to endeavor to elicit evidence which goes to establish his case, the proper time for such evidence being when the party is proving his case. . . . The reason of this rule is that to permit this would enable a party to procure the advantage of making the witness his own and at the same time precluding the cross examination by his adversary. 26 R. C. L. 1040.

The American rule is that the cross examination can only relate to facts and circumstances connected with the matters stated in the direct examination of the witness. If a party wishes to examine a witness as to other matters, he must do so by making the witness his own. . . . The rule limiting the cross examination to the general subject-matter of the direct examination is certainly more conducive to the systematic and orderly trial of causes, and it has the further merit that it prevents the cross examiner from proving, by leading questions, independent facts, by a witness friendly to him, whom the adverse party is obliged to call. This rule clearly applies when the attempt is made to draw out, by cross examination, facts having no connection with the matter stated in the direct examination but constituting the substantive defense or claim of the cross examiner. Jones, Ev. 2d ed. pp. 1038–1039.

It is not necessary in order to render a statement of a witness available for the purpose of impeachment, that it should be of such a character as should be admissible as independent evidence in the case. So, as the purpose of showing a contradictory statement of a witness is to impeach him and not to bind the party for whom he testifies it is not necessary that such party should have been present when the statement was made. 40 Cyc. 2707, 2708.

A question to an impeaching witness whether another witness used

certain language or words of that effect or of like meaning is proper. 40 Cyc. 2751, 2752.

The rule is well settled that the cross examination of a witness may properly be directed toward drawing from him evidence as to his interest or bias, and as to his relations with or feelings toward a party or as to his hostility toward or bias or prejudice for or against a party, or whether he has made particular statements or declarations tending to show such hostility to, or bias or prejudice for or against a party, as that he may be cross examined as to prior inconsistent statements. 40 Cyc. pp. 2662–2670; State v. Malmberg, 14 N. D. 523.

The right of the State to show on cross examination the nature of the relations existing between a witness and the accused, so far as their relations are such as would create a bias on the part of the witness which might reasonably be supposed to affect his testimony, cannot be affected by the fact that these relations may be such as to prejudice the accused in the minds of the jury. 40 Cyc. 2670.

A party who on cross examination interrogates an adverse witness as to interest, bias, prejudice or ill feeling on matters tending to show such interest or feeling is not bound by his denial, but may contradict him by other evidence, the matter not being collateral in its nature. 40 Cyc. 2674 and cases cited.

Evidence of every material fact or circumstance that will throw light on a homicide and every motive that might have influenced the mind of the accused, is relevant in a prosecution on the homicide charge. 2 Whart. Crim. Ev. p. 1681.

Presence or absence of motive is a matter of great importance as bearing on the question of whether or not the crime was committed by the accused. 2 Whart. Crim. Ev. p. 1647.

Evidence of similar acts affords the surest basis for inference that the crime charged was committed by the accused. 2 Whart. Crim. Ev. p. 1659.

There is ample authority for proof of alias and collateral crimes for the purpose of showing a motive for the commission of the crime for which the defendant is being tried; the limitations being that such alias crime must bear such relation to the crime for which the party is being tried that the court can clearly see that if established, it will have a tendency to furnish a motive for the commission of the other

crime. State v. Kent, 5 N. D. 549; State v. Mozinski, 191 N. W. 345; People v. Ascher (Mich.) 86 N. W. 140; St. Louis v. State (Neb.) 1 N. W. 371; Lillie v. State (Neb.) 100 N. W. 316.

In the sense of the criminal law, motive has been well enough defined as that which leads or tempts the mind to indulge in a criminal act. Thompson v. United States, 144 Fed. 18.

In murder motive is the impulse or purpose that induces the murderer to kill his victim. State v. Hyde, 234 Mo. 200, 136 S. W. 316, Ann. Cas. 1912D, 191.

Motive means reason, cause, inducement, an incentive to do the acts and things charged in the indictment. Ball v. Com. 125 Ky. 601, 101 S. W. 956.

Motive is an inducement, or that which leads or tempts the mind to indulge in a criminal act. People v. Fitzgerald, 46 N. Y. Supp. 1020, 50 N. E. 846.

Whenever the case is such that proof of one crime tends to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion. People v. Walters, 98 Cal. 138, 32 Pac. 864; State v. Williams (Vt.) 111 Atl. 705.

## Statement of facts.

PER CURIAM. The defendant was convicted of murder in the first degree. He has appealed from the judgment of conviction and an order denying a new trial. The record is voluminous. The facts necessary to be stated are as follows: In June, 1921, Marie Wick was a strong, healthy, good-looking, unmarried, and virtuous girl of eighteen years, living at Grygla, Minn., a small inland town about 100 miles north of Fargo, N. D.; she was steady and industrious; she possessed an ordinary education, supplemented by a business course had in a college at Warren, a small town not far distant from Grygla, Minn. She had never been in any town larger than Warren, Minn. Her parents were farmers living near Grygla. For some eight months prior to June 4th, 1921, she had been working for a co-operative company at Grygla. She desired and intended to visit her aunt at Pettibone, N. D., another small town some 150 miles west of Fargo, on a branch of

the Northern Pacific Railway. Thus, for her visit, she with her father went from Grygla to Thief River Falls on June 5th, 1921. She had then $20.00 in currency and a cashier's check for $20.00. The next morning she proceeded alone on the train (Soo Line) to Warren; thence, she proceeded, again alone, on another train (G. N. Ry.) to Crookston; thence, on a train (G. N. Ry.) from Crookston to Fargo, riding with some women and children whom she had met at Crookston. She neither talked nor paid any attention to other passengers on this train. Previously, she had written to one Rasmussen, a boy whom she had known since her childhood days at home, requesting him to meet her at Fargo, because never had she been in a town as large as Fargo. At Moorhead, a town across the river from Fargo, Rasmussen met her and rode with her on the train to Fargo. Together they walked from the G. N. depot in Fargo to the N. P. depot to ascertain when the N. P. train left the next morning for the trip to Pettibone. The parties with whom she rode on the train to Fargo, talked about going to the Prescott Hotel in Fargo. In fact, they did stop at this hotel. Mrs. Lawrence was the proprietress of this hotel. So, from the N. P. depot, they went to the Prescott Hotel. There they arrived about 10:15 or 10:20 P. M. There she was registered by the landlady, Mrs. Lawrence, assigned room 30, given a key to the room, and dated on the call sheet for a call at 6:30 A. M. Defendant Gummer was the night clerk at this hotel. He had shown to their rooms the parties with whom Miss Wick had ridden on the train from Crookston to Fargo. As he came downstairs, the landlady requested him to conduct Miss Wick to her room. This he did. She remained in her room for a few minutes, came downstairs, left her key at the desk, and, with Rasmussen, went to an ice cream parlor. In a short time she returned. Rasmussen left her and went to Moorhead. She procured her key at the desk, requested the landlady to change her call to 6 A. M. and proceeded to her room for the second time at about 11 P. M. Mrs. Lawrence and her son Fred retired about 11:40 P. M. All of the guests at the hotel had retired at or about midnight with the exceptions hereinafter noted. One Hagen arrived in Fargo on the N. P. train, No. 4, due there at 12:55 A. M. He went to another hotel, found it filled, then came to the Prescott; defendant assigned to him room 31, adjoining the room of Miss Wick. One Smith and wife came to this hotel after Hagen and

before 2 A. M. One McKenzie registered as a guest about 3 A. M. One Van Vorst, a guest, left at 11 P. M. and did not return until about 5 A. M. Another guest Myers, left the hotel about 11:30 P. M. and returned about 2 A. M. Pursuant to defendant's statements, a man, having the appearance of a laboring man, came to the hotel about 2 A. M., registered as James Farrell and was assigned room 40. About midnight Andy Brown, defendant's room mate, called at the hotel and visited with defendant. Pursuant to defendant's testimony, at 6 A. M. he called her room by phone; no response was given; again he called two or three times; then he rapped on the door; then he swept out the office; then he called on the phone again; then he got the keys, unlocked the door, walked in a few steps, backed out, went down into the lobby, stayed there a few minutes and then called Fred Lawrence, the son of the landlady. This was about 6:45 A. M. Lawrence went to the room; the door was locked; he looked over the transom; he directed a maid to open the door; a call was sent for the police and a doctor. The first officer to arrive was a police officer in Fargo. At the hotel he found Lawrence and defendant standing behind the desk. Defendant stated to the officer that a girl in room 30 was covered with blood and he thought it was suicide. Defendant then took the officer to room 30 and unlocked the door with a key having a brass slab attached to it. There they found Marie Wick in the room on the bed, stretched out, tied, gagged and bound, raped and murdered. Her arms were tied to the bed post above her head; pillow slips had been removed from the pillows; she had been gagged by inserting the major portion of a pillow slip in her mouth, slipping the balance over her face and bandaging it. In tying the girl, strips of a sheet had been used, torn from a sheet on the west side of the bed. The portion of the pillow slip in her mouth was not bloody; the portion outside, was soaked in blood. The bandages did not cover her eyes; they were wide open. There were four distinct finger marks on the left side of her throat and one on the right side, black and blue marks which had not broken the skin. Her head had been badly battered; at least four cuts appeared outside the hair line; and on top of the head, she had been struck seven or eight times by some heavy instrumentality; it required about 167 to 170 stitches to close these wounds; her skull had been fractured; her face showed signs of suffocation; the right arm had been securely tied with

seven or eight knots between the arm and the bed; the left arm had not been so tightly tied; the right arm and bandages thereon were free from blood excepting a few smears; the left hand and wrist were entirely covered with blood; the bandages around the left hand wrist were free from blood; an examination of her genital organs revealed that the hymen was partially ruptured and the vagina full of blood; it was apparent that previous to that time she had been a virgin; otherwise, there were no marks or bruises on her below the throat excepting a slight abrasion on the right elbow. Between the bed and west wall of the room there was a space of about 18 inches; there were smears of blood on the wall paper of this west wall; certain finger prints appeared on this west wall but they could not be read excepting that three finger prints appeared to be similar to those of the girl's left hand. There was an indentation in this west wall and also in a round at the head of the bed (as if made by a heavy bludgeon). On the carpet between this west wall and the bed there was a heavy deposit of blood; also, of white hair-like substance, which likewise appeared on the left hand and some of the bandages. The bed clothes were neatly pulled over her body; at the head of the bed, alongside the body, and underneath the bed clothes, towels were found; these towels showed traces of blood and verdigris, also mucous such as would come from the genitourinary tract. In the opinion of a doctor, the girl when examined about 9 A. M., had been dead four to six hours, possibly longer. Her clothes, hat, shoes, hose and toilet articles were arranged about the room; her two suit cases had not been disturbed; the only money found was a few pennies in her pocketbook.

Thus was Marie Wick found on the morning of June 7th, 1921. The state's attorney and police authorities immediately began a diligent investigation. All of the guests and persons associated or connected with the hotel were investigated and their possible connections with the affair ascertained. The situation of the room, the construction of the building in relation thereto, the manner and means through which the crime and crimes had been initiated, carried on and consummated, all produced evidence, now in this record before the court, which tended to establish that the crime had been committed by no one without, but by some one within and familiar with the hotel. By processes of elimination, unnecessary to relate in a detailed statement of facts herein, all

persons, guests in, associated or connected with, the hotel were absolved, through such testimony with probative effect, from any direct connection with the affair excepting James Farrell, the mysterious stranger, unknown and unfound, the defendant, and his room mate, Andy Brown. The defendant became an important personage concerning the affair, either as a witness or a principal. He advised and consulted with the authorities; he was questioned by them time and again. As the investigation proceeded, many conflicts and misstatements appeared in his stories. Finally, on June 14th, 1921, he was arrested, charged with the commission of the crime. After his arrest and while in custody, defendant talked freely about the affair with the authorities. The state's attorney had been theretofore a court reporter. He recorded in shorthand many of the questions to and answers by defendant in these talks by him had with the authorities. As a witness at the trial he verified in evidence defendant's talks and statements so made. Thus, with these statements of defendant, his evidence at the trial and other evidence adduced, there is evidence in the record to the following effect:

Defendant, a single man aged 22 years at the time of the trial, was born and reared near Mayville, a town distant from Fargo some 50 miles. From June, 1920 to about March 1st, 1921, he was employed as night clerk at this Prescott Hotel. This was his first experience in hotel work. Then he ceased this employment and for a time solicited insurance and later worked on his father's farm near Mayville. On May 27th, 1921, he resumed his employment as night clerk in this hotel and continued as such until his arrest on June 14th, 1921. The defendant previously never had been arrested nor charged with crime. Defendant's hours of service as night clerk were from 7 P. M to 7 A. M. As defendant expressed it, he had full swing of the hotel all night from 12:30 A. M. Defendant roomed at the Addison apartments, a few blocks distant from the hotel, with his room mate, Andy Brown, a painter by trade, aged 28 years. Sometimes, defendant, after his hours of service at the hotel, slept at the hotel because it was more quiet there. Between June 7th and June 14th, 1921, pursuant to the testimony of the state's attorney, defendant had several conversations with the authorities but no stenographic verbatim report of these conversations, only notes thereof, were taken. In the afternoon of June 14th, 1921,

before defendant's arrest, another conversation was had at the sheriff's office between the authorities, namely, the sheriff, a detective and the state's attorney, and the defendant. A stenographic report was taken of the greater portion of this conversation and it is in the evidence here. In the course of this conversation, defendant told about Brown coming to the hotel about midnight; how he mentioned to him about the swell looking girl in room 30; how Brown mentioned that he, Brown, needed a sexual affair; that Brown stayed there five or ten minutes; then he detailed an affair he had with a girl named Florence, the night of June 4th, 1921; this girl was getting a divorce; he took her up to her room, No. 50; he got into a conversation with her; later he went back to the room; and again to the room and had a sexual affair with her; then he mentioned about a girl whom he designated as a kid, Elvira, a kind of green girl but she had been married and had a divorce; he got into conversation with her; made remarks to her about putting her to bed; he did have a sexual affair with her that night, on June 1st, 1921, in room 50 of the hotel which he called the jazz room, meaning a room for sexual affairs; then, further, he stated in his previous experience at the hotel, he averaged about two a week (meaning sexual affairs with women); that he could average three or four a week if he was real industrious. Later, about 8 P. M. on June 14th, 1921, and before defendant's arrest, the sheriff had a conversation with defendant in which defendant stated that when he took Marie Wick up to her room he had a desire for sexual intercourse with her; that he called her up on the telephone that night and tried to "josh" with her but she cut him short and did not care to carry on a conversation; that then he further told the sheriff that he was at the hotel all night and did not go to meet a train as he had previously stated; that he might have dozed during the night although previously he had stated that he was awake all night. After this conversation with the sheriff defendant went back to the hotel office and in a short time he was arrested. Then about 2:00 A. M. on June 15th, 1921, after defendant had been arrested and after the state's attorney had talked with defendant in the jail, at about 10:30 P. M. without taking any shorthand notes of the conversation, another conversation was had in the county jail with defendant. Then the defendant was in custody, under arrest, but no warrant had been issued.. The state's attorney, the sheriff, the

detective and others were there. The defendant was asleep when they came in. He was aroused. The state's attorney testified that some one said "Wake up, Bill" or "Get up" as they came in and he took the first question that was asked him, after they came into the room, in shorthand and that, from the time these questions and answers commenced until they closed, as disclosed by the stenographic record, every question and answer which was asked him during that space of time was taken down in shorthand. Defendant stated that he called Marie Wick at 6:00 A. M. She did not answer; he called her again in probably ten minutes; he called her three times on the phone; then he went up and rapped on the door and heard nothing; then he rapped on the door again; he took the keys along, two keys on a safetypin; he unlocked the door, opened it and looked in to see her and there she lay, just as she was found in the morning; he did not take more than three steps inside; then he locked the door; then went downstairs and called Fred Lawrence; Lawrence said he was tired and wanted defendant to call him in about twenty minutes; defendant said that the girl had either got sleeping sickness, or was dead, or something; that Lawrence suggested that he get a glass of water and throw it over the transom and told him to look over the transom and see if anybody was in there; that the defendant went down and pulled a table up to the door and looked over the transom. That he was afraid to tell that she was dead. After he was in the room the first time he locked the door again: The keys he had were skeleton keys: He knew that if the key to the door was in the door his skeleton key would not open it. Then defendant stated that he called her up about 11:30; he asked her if she had gone to bed; She said that she was just about ready to go to bed: Defendant said, "So early?" Immediately she said "Call me at 6:00." He called her up because if she had wanted to carry on a conversation and started kidding along, if she had let on that she was a "sporty girl" and he thought there was "anything doing," he naturally would have gone up there. In this telephone conversation he might have asked her if she needed any help to go to bed or something like that but she chopped off, did not want to talk about it, and said "Call me at 6:00." Then, further, defendant stated that there were two girls who were steady roomers at the hotel with whom he never tried to have any sexual affairs; that the longest he ever talked to any girl before he had a

sexual affair with her was with this kid Elvira. Then he said that; generally, as a matter of fact, when a single woman came to that hotel who was goodlooking at all and did not seem to have some fellow of her own, he would try her out in some way to find out if she was sporty: He would kid her along that line like a d— fool: Further, that the girls usually fell for him quickly; that he did not fall down on many whom he tried there at the hotel; that when he took Marie Wick up to the room he thought of having a sexual affair with her; it kind of entered his mind; he was kidding her along: If she had been a girl that wanted a sexual affair he would have had it: When she did not want to talk to him, he rather thought that she was kind of innocent and never had had a sexual affair.

As previously mentioned, defendant, in some of his admissions made to the officers, stated, concerning this James Farrell whose name was written on the hotel register and to whom he assigned room 40 in the hotel, that about 2:00 A. M. this party appeared, dressed somewhat like a laboring man, registered and was assigned to room 40; that he went to his room and some time thereafter came down, left the hotel, and did not return.

Andy Brown, the roommate of defendant, was used by the state as a witness. He identified numerous exhibits, some of them postcards, some written in the office of the state's attorney when Gummer was present and some in the Cass County jail, all as being in his handwriting. Later, the state, through experts on handwriting, adduced evidence to the effect that the signature of James Farrell on the register was in the same handwriting as that upon the exhibits as written by Brown. Upon cross-examination of Brown, the defendant sought to inquire whether, in fact, he had written the signature of James Farrell upon the register. An objection of the state to this question was sustained.

Further testimony was adduced on the part of the state, through the witness Charlson, that at about 6:30 A. M. June 7th, 1921, Andy Brown was seen by the witness to come in the back door at the Addison apartments, hurriedly and in an apparent excited condition, and to go to a telephone booth and engage in a telephonic conversation. The defendant objected to this testimony and the overruling of his objection is again specified as error by the trial court. Andy Brown testified as a

witness for the defendant. He stated that on the night of June 6th, he arrived at the hotel at 12:20; that previously that evening he had been to a show with a young lady whom he had taken to her room and left at midnight; that he was a painter; that he was dressed in his street clothes; that he always wore his street clothes until he went to work, his working clothes being at the place of his job; that he found defendant that night at the desk, sitting in a chair back of the cigar case or counter; that their conversation concerned Brown's girl, about business at the hotel, and about a good-looking girl having checked in there; that he was not in that hotel after 12:50 A. M. that night and did not return to the hotel after he left; that, after he left the Prescott Hotel, he went to a pool room for a drink; that he left the pool room about 1:10 A. M., went directly to his room and retired; that there he was in his room from a few minutes after 1:10 A. M. until 7:00 A. M. when he was called by Mrs. Thompson (the proprietress of the Addison apartments); that he did not write any name upon the register of the Prescott Hotel or the name of James Farrell thereon; that, with the exception of just one second, defendant was in his presence all the time he was there; and that no person entered the lobby while he was there. Upon cross-examination, the state sought to show that this witness Brown had made contradictory statements inconsistent with his testimony as given upon direct examination. On rebuttal, the state introduced the testimony of Mrs. Thompson, the proprietress of the Addison apartments. She testified that Brown occupied the room next to her room, with a partition between the two rooms; that, on the night of the crime, he came to his room about 11:55 P. M. and went out again in a few minutes; that she did not call him on the morning of June 7th, the morning of the crime; that she did not see him again until about noon of that day. Further, on rebuttal, the state introduced some evidence, through the witness Schultz, that while defendant was a prisoner in the Cass County jail, being held there as a witness, he, Brown, told the witness Schultz to tell defendant "not to squawk until the last minute" and also told such witness "don't let anybody hear you tell him." The defendant objected to such testimony and it is made the basis of error by the trial court.

In the record there is the testimony of the witness Osman introduced by the state to the effect that in the latter part of October, 1920,

having arrived in Fargo on N. P. Train No. 4 at about 2:30 A. M., she went to the Prescott Hotel and registered there October 23rd, 1920. She was 21 years old and was a stenographer. The defendant started a conversation with her. She did not notice much what he was saying. She requested him to show her to the room. In the room he turned on the light. She walked in and stood in front of the door. He stood opposite to her and again started to talk to her. He took hold of the handbag and said, "Got any jack?" She said "No" and jerked it away. She asked him to leave the room. He said "Shall I take off your shoes?" She said "No." Then he said "Oh, don't they come off?" and then left the room.

The Hotel Prescott was a 3½ story building with a two-story annex at the rear. The lobby of the hotel, where the clerk's desk was, is in the front of the building on the ground floor. Room 30, to which Marie Wick was assigned, is located on the second floor. On this second floor there are 16 rooms in the main part of the building and, in the second story of the annex, three rooms which were occupied by the Van Vorsts, husband and wife. Room 30 was located at the rear of the main building and next to the annex. Fred Lawrence, the son of the proprietress, occupied room 20 in the front of the building. Room 31, adjacent to room 30, was occupied by Mr. Hagen after he came off the train on the night of the crime. Room 9, adjacent to room 30 but in the annex, was occupied by Mrs. Van Vorst on the night of the crime. The room directly beneath room 30 was occupied by a chambermaid at the hotel. Room 46 on the floor above was occupied on the night of the crime by one Christianson, a steady guest at the hotel. Between rooms 30 and 31 there was a communicating door. When the crime was discovered by the authorities the door between rooms 30 and 31 was found locked. The keyhole was plugged from the side of room 31. The door was also nailed. Further observation disclosed that the door was dusty on the side of room 31 and had no appearance of having been touched so far as the keyhole was concerned. On the door to room 30, going into the hall, there was a Yale lock, which, from the hall, appeared to be, though in fact it was not, in working order. The door leading into this room 30 could be locked or unlocked by a plain key for an ordinary door lock. Further, there is testimony in the record to the effect that the only possible points of

ingress and egress to and from the hotel and this room 30 were the main door leading into the lobby, a window in the hall of the so-called annex, a window in the dining room on the first floor immediately off the office and a few feet from the lobby, and a window from a room on the fourth floor. With respect to these ways of entrance or departure, testimony was introduced by the state to the effect that they were either locked or in such condition that they could not be opened, or had not in any manner been used, excepting a way leading into the lobby and to the main door of the hotel. In the record there is evidence of two witnesses who heard noises during the night of the crime. Mrs. Van Vorst, who occupied the room in the annex adjacent to room 30, testified that between 12:30 A. M. and 2:00 A. M. she heard noises such as thumps or thuds or like one throwing a baseball against the wall of the hotel. She went to sleep and awoke again about 2:00 A. M. The chambermaid who roomed in the room beneath room 30 testified that at about 4:00 A. M., she suddenly heard someone jump out of the bed in room 30 and strike the bed a few times. She heard somebody there walking about and heard a door open and close and someone walked down the hall the front way. Mr. Hagen, who had a room adjacent to room 30, being very tired and sleeping soundly, heard no noises or disturbances. Mr. Christianson, who roomed above room 30 on the next floor, was the foreman of a construction company. He went to bed about midnight. He was pretty tired. He got up about 5:45 A. M. He heard no noises below him during the night.

At the end of the hall on the second floor and some distance from room 30, was located a fire hose with a metal nozzle. In the forenoon following the discovery of the crime, this nozzle was found lying on top of the hose rack, but not screwed upon the hose. It was so bent out of shape that it would not screw upon this hose. Upon this nozzle were found pieces of flesh, blood and hair. This nozzle fitted into an indentation existing in the west wall of room 30.

This is a brief narrative of the circumstances of the crime as gleaned from the voluminous record of a trial which consumed the major part of a month.

Pursuant to the theory of the state, Marie Wick was killed by one who entered her room, in the first instance, for the purpose of having sexual intercourse with her; that, in order to accomplish this purpose,

it was necessary by force to choke and gag her; that she was thus choked into unconsciousness immediately and before she had an opportunity to awaken; that this crime in its larger aspect was committed through two separate crimes; the first between about midnight and 1 A. M.; and, the second, about 4:00 A. M.; that the person who committed the crime knew that Miss Wick was in room 30 and knew that he could act without detection; that the choking, gagging and rape took place between 12:00 and 1:00 A. M., and the blows about 4:00 A. M.; that the motive which finally prompted the killing was a fear of discovery and that the only person who needed to fear recognition was some person known to Marie Wick and who had been exposed so as to be known to her; that the crime was committed by some person within the hotel since there was no means of ingress or egress as disclosed by the evidence excepting the door leading into the hotel lobby; that the bandages which had fastened the gag into her mouth did not cover her eyes; that she became conscious because she struggled and threw herself off of the bed, with her head hanging between the bed and the wall, and made a mark with her left hand upon the wall; that the murder was not necessary to accomplish the rape because the choking, gagging and tying was sufficient to permit the accomplishment of such act; that the hose nozzle was procured and she was beaten about the head; that some of the blows missed when her head was moving about and hit the round at the head of the bed and the wall; that then her body was arranged upon the bed and the bed clothes upon her; that nearly a dozen times she was struck and her blood flowed copiously upon the carpet, while her head was between the bed and the wall; that the nozzle was wiped off and put back in its place; that the key which locked, from the inside, the door to room 30 was dislocated and then the key of the hotel used to unlock the door; that the name James Farrell was placed upon the hotel register through the procurement of defendant to aid in concealing the crime of rape. Thus does the state conclude upon the record and the evidence from the physical facts and all the surrounding circumstances that the defendant committed this crime; that he had the desire, purpose and opportunity for sexual intercourse and to commit rape in so doing, and that the murder followed, as a result of the accomplishment of such purpose and of the necessity of forever sealing the lips of the one person who could identify the perpetrator of

the crime; that even her money was stolen for the purpose of making it appear that the motive was robbery rather than rape.

## Decision.

The record reveals the evidence to be wholly circumstantial. With the law concerning circumstantial evidence, and its effect, there is no disagreement. It is conceded that the trial court submitted the cause to the jury with proper instructions in that regard along well settled and well recognized legal principles.

*Defendant's First Contention.* Upon general perspective the first broad contention is made that the evidence is not absolutely consistent with guilt and inconsistent with innocence; that the cause of the state in its general aspects rests upon suspicion and not proof; that the circumstantial evidence, viewed as a whole, is, as a matter of law, insufficient to support or warrant the verdict for the reason that it does not exclude every reasonable hypothesis of innocence; and further, too, because upon such circumstantial evidence the defendant can just as consistently be found to be innocent as to be guilty.

Circumstantial evidence, of course, is evidence. As Wigmore in his monumental work on evidence has stated, there are two kinds of evidentiary facts: (a) The assertion of human beings, i. e. testimonial or direct evidence; (b) Any other fact, i. e. circumstantial or indirect evidence. 1 Wigm. Ev. 2d ed. § 24. Circumstantial evidence may just as unerringly prove or establish a fact, within the realms of logic and reason, for human minds, as evidence perceived and related through the senses. In the case at bar, the fact of the crime, in its general essentials, being admitted, the paramount question arose,—Who committed this crime? Man, woman, or beast? Assuredly, upon this record, it may be said that it was neither woman nor beast but man. Next, followed the query,—Was this man one from without, or one from within, the hotel? This query is answered by circumstantial evidence in the record, sufficient for the jury's consideration, to the effect that only some man from the vantage position of being within the hotel, had the available opportunity to commit, and did commit the crime. Then follows the logic and reason of the situation to human minds,—namely, if a man and woman be locked within a sealed com-

51 N. D.—30.

partment and the woman is raped and murdered, the survivor is the rapist and the murderer. Again, elaborating, if instead, five persons are in such sealed compartment, but each in a separate subcompartment therein, and one of such persons is raped and murdered, some one, or all, of the persons surviving are rapists and murderers; or, if three establish an alibi or non-connection, then the fourth is the rapist and the murderer. The legal inquiry is ascertainment or identity and the legal evidence that proves ascertainment or identity.

There is evidence in the record, if within legal rules, sufficient for the jury's consideration that no person within the hotel had connection with the crime, excepting possibly the mysterious James Farrell and the defendant. Who was James Farrell? The state answered by proof that James Farrell was a fictitious person whose name had been written upon the hotel register by one Brown, the roommate of the defendant, in defendant's presence. So, defendant did commit this crime unless some other, or any other reasonable hypothesis of innocence can be gleaned from the evidence. The law, of course, presumes defendant to be innocent. He must be proved guilty beyond a reasonable doubt. Defendant says any one of a dozen men might have committed the crime. But this is not a case of speculation but of proof; not of suspicions, as defendant suggests, but of facts proven. Hence, follows the chain of circumstances to establish the fact of guilt beyond a reasonable doubt and to eliminate any other reasonable hypothesis of innocence. The state asserts, and the evidence is sufficient to support, as a finding of fact, that the person who raped Marie Wick murdered her. Consequently, the motive of the murderer is involved and it is to be found associated or identified with the motive and intent of the rapist.

Directly, already upon logical grounds of reasoning, the finger of guilt has been pointed towards the defendant. But to the rational mind of ordinary men of ordinary understanding the law requires, lest any innocent man might suffer, proof beyond a reasonable doubt. The reason for his guilt must appear; otherwise, the reasonable mind and the mind of reason might point to some other hypothesis to explain his innocence, such as defects in eliminating other possible participants, impossibility or improbability of performance for any proper reason. Thus, comes within the comprehension of the reasonable mind the

necessity of identifying the guilty perpetrator to a moral certainty. Thus are concerned the elements of primary motive and intent. Within these may be considered desire, willingness and intent to accomplish that desire, personal ability to accomplish the ends of that desire, the personal and peculiar plan always or generally adopted or followed to accomplish that desire, the opportunity afforded for the consummation of the desire, and the general primary motive and intent all pervading the affair. What desire had defendant? The state answers, in the evidence, a desire sexually that predominated his thoughts and personal activities to the extent that he might be classed as a pervert; sexed strongly, the lascivious thought and the sexual impulse to him in his desire was ever uppermost for access and approach to a woman pleasing to his fancy. Towards Marie Wick this very desire was expressed in his mind when first he saw her and it continued by his actions towards her until and after she retired to her room. It was again evidenced in his communing with Andy Brown about or after midnight: The continuity and domination of this desire was further shown by his expressions concerning womanhood generally, by his expressed desires and actions towards other women who had been guests at this hotel.

What willingness and intent to accomplish his desire did defendant express, generally or particularly, as concerns Marie Wick? The state answers in the evidence:—As a general proposition defendant could, by his easy mode of approach, accomplish his desire with the woman of his choice; when he wished and willed it was simply a matter of a little activity along the lines of his knowing how to act. His method of approach and accomplishment was evidenced by his own acts towards other women who had stayed or been guests at the hotel. Toward Marie Wick the same method of approach was used up to the time when she retired. His methods of approach and accomplishment were impliedly continued when he was talking with Andy Brown at or about midnight concerning the possibilities of an affair with the girl in room 30, namely, Marie Wick.

What personal ability to accomplish the ends of his desire did defendant possess? The state answers in the evidence;—his own expressed ability, repeatedly stated; his own acts with other women in the hotel.

What personal and **peculiar plan did** defendant always or generally

adopt or follow to accomplish his desire? The state answers in the evidence;—a plan of solicitation, which, as artfully applied by him, brought the results he sought.

What opportunity was afforded defendant for the consummation of his desire? The state answers in the evidence;—defendant came in direct contact with Marie Wick; the desire possessed him; it was with him from the time he first met her and until after she retired to her room; it still possessed him when he was talking with Andy Brown about midnight, or after; he had charge of the hotel after midnight and as such owed some duty of protection to the guests; the guests were within his keeping. He was familiar with the entire hotel and its surroundings; he knew how to gain access to room 30; he knew that although this room had the appearance of being locked by a Yale lock, that the Yale lock was not functioning; that the door thereto could be opened by an ordinary key; he had a key in his charge and under his supervision that would open this door; he knew that there was no means provided for locking this door on the inside except by the key which would lock it from without; he knew the probability or improbability of detection during the time when he would be accomplishing his desire.; he had accomplished his desire before in this very hotel when he was on duty and had not been detected; he knew that to him was presented the opportunity of acting when the opportune time came, because it was his duty to be awake, upon guard, and possessed of all his active faculties, while others within the hotel slept.

What was defendant's general primary motive? The answer upon the whole record is an impelling sexual desire. What was defendant's intent? The answer is, again upon the whole record, to accomplish this sexual desire, first, perhaps without thought of force; then, followed by force which became necessary to overcome resistance; then, detection being forecast, artfulness came to create a fictitious guest, Farrell, to conceal the identity of the performer; then, force resulting in murder and theft to escape detection and to provide concealment. Defendant's contention that always heretofore in the sexual desires and their accomplishment by defendant the element of force was ever absent is answered by the observation that theretofore always the force of persuasion had been sufficient; with Marie Wick the force of brute strength was required. And, so upon the record, we are satisfied, as a

matter of law, that the verdict of the jury finds support in the evidence and should not be disturbed in the absence of prejudicial error otherwise existing in the record.

*Defendant's Second Contention.* This is based upon the general complaint that the state was permitted, over defendant's objection to practically associate the witness Brown as a co-defendant with defendant in the trial of the case and to place all of the inference and suspicions which the state had against Brown, as a part of the case against defendant; that this resulted in practically requiring defendant to acquit Brown in order to acquit himself, although Brown was neither arrested nor prosecuted for the crime but was simply held as a witness; that Brown was considered by the state in the same light as defendant, namely, as one of the perpetrators of the crime; that no conspiracy between them was charged in the information; yet, the whole theory of the state was based on the existence of a conspiracy.

As supplemental to this general complaint, the defendant further specifies that the trial court erred in sustaining the state's objection when defendant, on the cross-examination of Brown, as the state's witness, sought to show that Brown did not write the name Farrell on the hotel register. (Later, as a witness for defendant, Brown did thus testify); further, that the trial court erred in permitting the witness Charlson to testify that Brown came to the Addison apartments on the morning of June 7th, 1921, about 6:30, apparently much excited, and hurriedly went to a booth and engaged in a telephonic conversation; further, that the trial court erred in permitting the witness Schultse to testify that Brown told the witness to tell defendant "not to squawk until the last minute" and "don't let anybody hear you tell him."

Brown's connection with defendant so far as the state's case was concerned was disclosed through defendant's statements made to the authorities before and after his arrest; these statements were introduced into the evidence by the state. They simply showed that Brown was the roommate and intimate associate of defendant; that Brown, on the night of the crime and about midnight called at the hotel to see and visit with defendant; that there in the lobby of the hotel in defendant's presence during all of a period of time not exceeding about 30 minutes Brown and defendant talked about girls and the girl in room 30; that then Brown left to go to the Addison apartments. The

state used Brown as its witness for the sole purpose of procuring his identification of his own handwriting. Brown made such identification concerning numerous exhibits. Then the state, through experts, introduced evidence to show that the writing on the exhibits was in the same handwriting as the name, "James Farrell" on the hotel register.

In the task of establishing the proposition to be proved, namely, that defendant committed the crime, it was necessary for the state, through relevant evidence, to adduce much so-termed negative testimony. In the process of elimination, many persons were concerned who were within the hotel during the night of the crime. For instance, Lawrence, Hagan, Myers and others might be mentioned. These, under the circumstances of the state's evidence, the state must first identify and then eliminate as possible or probable perpetrators. So it was necessary for the state to eliminate the possibility or probability of an outside perpetrator. Accordingly, testimony of the acts and conduct of these men during the night of the crime or of their surroundings, including the possibility of ingress to the hotel from without, was competent and relevant whether occurring in or without the presence of defendant. So, it was necessary and proper for the state to first identify the mysterious "James Farrell" and then eliminate him as a perpetrator. If Brown wrote the name "James Farrell" on the hotel register, then the acceptance of this as a fact through proper testimony both identified and eliminated James Farrell as being a fictitious person. This fact, if so established, served further as a corroborative circumstance that the name was so written in defendant's presence or with his procurement for some purpose of concealment. It was proper for the state to show that Brown wrote the name "Farrell." It would have been proper for the state to show that Brown wrote the name "Farrell" on the register out of the presence or without the knowledge of defendant; all for the purpose of eliminating Farrell as a person or as a person concerned with the crime. The fact that his name, "Farrell," was written by Brown in the presence of defendant or even with his procurement did not make Brown necessarily a co-conspirator with defendant; for a multitude of reasons, Brown, through defendant's procurement, might have written such name. The sole purpose of the state was to show that the name "Farrell" was fictitious and that Brown wrote his name; then, it was proper for the state to show through some

testimony that Brown had the opportunity to write such name. This it did through the testimony of the witness Charlson that Brown came in the back door of the Addison apartments at 6:30 A. M. on the morning of the crime, and also, as a concomitant part of the act of so writing the name, and of the opportunity therefor, that Brown appeared then, dressed in his street clothes, in an apparently excited condition, and hurriedly went to a telephone booth.. His arrival at a certain time, his physical expression, whether he was dressed for work or not, whether he was excited and hurried or not—not his mental expression—was a circumstance as an observed fact, concerning the act of writing the name on the register and the opportunity therefor. Thus considered, it might be treated as a concomitant part of the act connected with the making of the signature. 1 Wigmore, Ev. 2d ed. p. 466.

Whatever Brown's participation in the whole affair was, the proof of the state did not proceed further than to show that Brown wrote the name "Farrell" on the hotel register with defendant's knowledge or consent, and that whatever Brown did at the hotel on the night of the crime, as revealed by the defendant's admissions, was in the presence of the defendant. This falls far short of showing that the state either asserted or sought to prove that Brown was a conspirator in the commission of the crime charged. Defendant's statements, his evidence later, as well as that of Brown, eliminated Brown as a conspirator in the crime so far as this record is concerned. The trial court properly rejected the attempt of defendant to show on Brown's cross-examination that the signature "James Farrell" was not written by Brown. Jones, Ev. 2d ed. 1038. Further, the defendant objected to the admissibility of the testimony of the witness, Schultz, wherein he stated that the witness Brown said to him: "Tell Gummer not to squawk until the last minute," and, "don't let anybody hear you tell him." If the state could prove that Brown was in some way connected with the case, or showed unusual interest in the matter, it would affect his credibility, and, therefore, on cross-examination, it was proper to ask him whether he had made such statements. He denied making them, and to impeach him the defendant Schultz was placed on the stand and these questions, objected to, were propounded to him. It is the claim of the defendant that this impeachment was highly prejudicial to him as

being part of an attempt by the state to prove a conspiracy between Brown and the defendant. The trial court specifically limited this testimony to the question of the "interest" of Brown in the case. It is clear the testimony was admitted to show the bias, or prejudice of Brown, in favor of the defendant. Brown was the defendant's witness. Foundation had been laid for the reception of this testimony. The state was not bound by the answers of Brown and had a right to show statements inconsistent with his testimony. It does not fall within the rule prohibiting impeachment on a collateral matter and therefore was admissible. State v. Malmberg, 14 N. D. 523, 105 N. W. 614.

*Defendant's Third Contention.* This relates to restrictions imposed upon the cross-examination of the state's attorney as a witness.

Upon cross-examination of the state's attorney, defendant's counsel inquired if it was not a fact that during that conversation the lights in the room were snapped off and on. To this question the state objected unless it related to a time prior to the conclusion of the admissions which were testified to. This objection was sustained by the court. The court suggested that defendant's counsel should ask the question and let them state when it did take place, if it did take place. Then the questions were asked, viz.

Q. Now, Mr. Green, is it not a fact that some time during the visit to the jail and to the cell in which Mr. Gummer was locked, that these lights, the electric lights, were snapped off and on at different times?

A. I will answer that in this way. At no time prior to the conclusion of the admissions which we testified to yesterday were the lights snapped off or on.

Q. I will ask the question again. Now, Mr. Green, will you kindly answer my questions, were the lights snapped off and on during that conversation?

Objection was made for the reason that the question did not fix the time. This objection was overruled. The court indicated that if it transpired after the admissions took place the testimony would not be competent. Then the defendant made an offer of proof that, at the time referred to by the state's attorney in his testimony, some of the persons present used violence and threats towards the defendant and that the lights were snapped off and on and that chairs were slid and pushed about on the floor, and light and indecent talk was indulged

in and defendant told he would be removed to Bismarck before morning; that, if the people knew, they would mob him, and that defendant was not permitted to dress or clothe himself during that period. Then the state stated that it had no objection to the showing of any such matters, providing they were confined to a time prior to the conclusion of the admissions testified to as having been made by the defendant, but, if such offer referred to any time subsequent, it objected to the offer as immaterial, incompetent and irrelevant. The court sustained the objection, if it related to matters or conduct had after the conclusion of the admissions which were testified to by the state's attorney, but, indicated that evidence of such conduct would be admitted, if it related to a time, prior to the beginning of such admissions. Then defendant propounded the question to the state's attorney. "If any of these matters or things occurred which we referred to and did not take place until after the confessions were made—." The state objected to this question upon the ground that it was an indirect way of getting into the record that which defendant could not get in directly. The court indicated that the question could be asked in another way. Then defendant's counsel suggested that the court ask the proper question. Then the court propounded this question:

"The Court: Did any matters, or things, or conduct, such as has been mentioned in the offer of proof, did any such thing take place before the admissions were made?

A. Before the conclusion of the admission, no."

It must first be observed that the witness' testimony, as refreshed from his stenographic transcript, related to and covered every question propounded to and every answer made by defendant during the time of the examination on the morning of June 8th. Defendant on cross-examination sought to elicit the answer that threats and force were used upon defendant during the time of this examination. The state objected unless the time was fixed. The trial court indicated that anterior to or during such examination and until the end of the questions and answers, questions concerning the use of threats and force would be proper. Defendant's counsel requested the court to propound the question and in response to the court's question, the witness answered that during and up to the time of the conclusion of the answers nothing occurred as the offer of proof indicated. Defendant's counsel

did not then renew his offer of proof so as to fix the time of the occurrences anterior or during the time of such examination; nor did he offer to prove that such occurrence happened at such a time or so adjacent in point of time and sequence as to be part and parcel of such examination. No attempt was made by defendant's counsel to show that such occurrences which he offered to prove occurred during the same interview when the questions and answers were made. We are satisfied that the trial court did not err in this regard upon the record as made by defendant's counsel.

*Defendant's Fourth Contention.* There are assignments of error challenging the correctness of the rulings of the trial court with reference to the admission in evidence of certain statements made by the defendant soon after the crimes were committed and also the admission of testimony on the part of a girl, who had visited the hotel some eight months prior to the crimes, as to certain acts of the defendant at that time. The principal interview with the defendant, at which the statements were made, was had at about two o'clock A. M. on June 15th in the jail in Fargo. This interview was taken down in shorthand by the state's attorney and, upon the trial, the transcript was read to the jury. It seems that prior to its being read and in the absence of the jury, the defendant's objections to the contemplated procedure were made to the court and all objections were overruled. The objections were directed not only to the answers given by the defendant, but to the form of some of the questions as well, and were sufficient to direct the attention of the trial court to the vice, if any, in their admission. The principal argument in the briefs under this head is devoted first, to the admission by the defendant that on at least two other occasions between May 27th and June 6th he had had immoral relations with two women of easy virtue in the hotel; second, to the salacious character of the questions put to the defendant at the time the admissions were obtained, it being claimed that they were so phrased as to give the jury the impression that the defendant was abnormal in sex matters; and, third, to the testimony of a girl concerning advances made by the defendant upon the occasion of her stopping at the hotel some eight months before the crimes in question.

It is the contention of the state that the evidence of other acts of the defendant at other times and concerning other women is admissi-

ble upon at least one of the following grounds: That in view of the whole case, it tends to prove one or more of the elements making up the case and is consequently relevant; that it tends to prove that the defendant possessed the motive that actuated the crime charged and proved by the other evidence; or, that it shows a plan of action pursued by the defendant on former occasions which is so far similar to the plan pursued in the instant case as to have characteristics in common with it; and that it has a legitimate tendency to establish the identity of the defendant as the perpetrator of the crimes. As against this contention the appellant asserts that all of this evidence is of a highly prejudicial character; that it constitutes a direct assault upon the character of the defendant; that the obvious effect of its introduction was to create in the minds of the jury the impression that the defendant was sexually degraded; and that he possessed an abnormal desire for promiscuous sexual intercourse which was thus made to appear to be so strong as to readily lead the jury to infer guilt in the particular case. It is said in short that the law does not allow another crime to be proved for the purpose of establishing thereby the commission of the crime for which the defendant is on trial, particularly where the crimes are not so related as to involve the same parties or so connected that proof of one may be said to be a part of the res gestæ of the crime under investigation.

This evidence is not to be considered as a detached part of the case but must be viewed in the light of the circumstances which are otherwise disclosed in the state's case. For, obviously, evidence which under given facts might be wholly improper and prejudicial would, under other facts, fall within the legitimate range of inquiry and be admissible regardless of its prejudicial character. If the other circumstances be such as to point to the logical and legal relevancy, the evidence objected to may be none the less proper, notwithstanding admissions made by the defendant concerning his lascivious thoughts towards the victim. It cannot be argued that, as the defendant was shown to have admitted a desire to gratify his sexual passions with her, it was not necessary for the state to prove such passion by showing his conduct towards others in a similar situation. At the time this evidence was offered, the state was justified in assuming that the defendant might deny the truth of the statements previously made by him, or some of

them, and it was the duty of the prosecutor to present all the evidence he had which would tend to connect the defendant with the crime charged. If it is a matter of any importance, it must be borne in mind that this suddenly aroused passion for Marie Wick is not an admitted fact in the case. It is only a fact for purposes of this trial if the state has proved it, and the defendant's admission is only evidence of the fact for what it is worth. On the trial he sought to destroy the effect of the admission entirely.

Is this evidence properly in the case for any purpose? While the circumstances of the crime have been somewhat fully stated heretofore, it is proper here to again summarize what is shown, both by the evidence objected to and by that which is not subject to the particular objection. It is only in this way that its significance and bearing can be properly ascertained. It is shown that the defendant was in the vicinity of the crimes in question (the rape and the murder) when they were committed; that he was in a superior position to know the facilities afforded for accomplishing acts of sexual intercourse and for concealment afterwards; that on different occasions in the past he had used the vantage ground afforded by his position to gain admission to the rooms of other guests, and, while there, to make indecent proposals which in some instances were assented to; that in the instant case there was a like opportunity open to him; that somebody had entered the room of the victim actuated by a desire for sexual gratification; that the defendant generally took measures to ascertain whether attractive female guests were susceptible to his advances and that they generally "fell for him;" that such measures were taken by him in the case of this victim; that he was attracted by her to the extent that his passion was aroused and that if she had shown a "sporty" inclination he would have gone to her room; and that the desirability of the victim for his lustful gratification was under discussion between him and his intimate associate, Andy Brown, with whom he was prone to discuss such matters, a very short time prior to the crime.

The evidence objected to shows how the defendant acted on other occasions towards women with whom he sustained the same relation as with Marie Wick (that of hotel clerk and guest) on the night in question. His actions on those occasions were the manifestations of desires then experienced and, according to his admissions, such desires were

prone to manifest themselves in a similar manner towards all women who were attractive to him and who were so situated as to afford him opportunity of access in the hotel. If these acts, so connected with the defendant in his surroundings, properly evidence the desire experienced by him when he was situated as he was on the night in question, they are admissible to establish that desire, as an attendant circumstance, notwithstanding the fact that they constitute proof of other offenses or acts involving moral turpitude. It is settled law that the proof of the crime with which the defendant is charged is in no way restricted by the fact that evidence to establish some of the attendant facts will involve proof that the defendant on another occasion committed a wrong or a public offense. That is, if evidence of prior acts is relevant as to some element of the crime in question, it is none the less admissible because of the acts being prohibited by law.

Wigmore, in considering whether facts relevant for some other purpose should be rejected because they would be inadmissible if offered to show a bad character, says:

Wigmore, Ev. 2d ed. § 216. "If there is any other material or evidential proposition, for which it is relevant, and if it is offered for that purpose, it is receivable, and its quality as misconduct or crime does not stand in the way. The persistency of this fallacy, and its lack of foundation in law make it worth while to exhibit fully, from the utterances of the judges, their constant repudiation of the notion that the criminality of the conduct offered for some relevant purpose is any objection to its reception."

He then quotes, among others, the following expressions:

Johnson, J., in People v. Wood, 3 Park. Crim. Rep. 681: "The proper inquiry, when the circumstance is offered, is, Does it fairly tend to raise an inference in favor of the existence of the fact proposed to be proved? If it does, it is admissible whether such fact or circumstance be innocent or criminal in its nature. It does not lie with the prisoner to object that the fact proposed as a circumstance is so heinous in its nature and so prejudicial to his character that it shall not be used against him, if it bears upon the fact in issue. The atrocity of the act cannot be used as a shield under such circumstances, or as a bar to its legitimate use by the prosecution. If it could, many crim-

inals might escape just and merited punishment solely by means of their hardened and depraved natures."

Cushing, Ch. J., in State v. Lapage, 57 N. H. 288, 24 Am. Rep. 69, 2 Am. Crim. Rep. 506: "I think we may assume, in the outset, that it is not the quality of an action, as good or bad, as unlawful or lawful, as criminal or otherwise, which is to determine its relevancy. I take it to be generally true, that any act of the prisoner may be put in evidence against him, provided it has any logical or legal tendency to prove any matter which is in issue between him and the State, notwithstanding it might have an indirect bearing, which in strictness it ought not to have, upon some other matters in issue."

Brewer, J., in State v. Adams, 20 Kan. 319: "Whatever testimony tends directly to show the defendant guilty of the crime charged is competent, though it also tends to show him guilty of another and distinct offence. A party cannot by multiplying crimes diminish the volume of competent testimony against him."

Allen, J., in Com. v. Robinson, 146 Mass. 571, 16 N. E. 452: "Such preliminary acts are competent because they are relevant to the issue on trial; and the fact that they are criminal does not render them irrelevant. Suppose, for further example, one is charged with breaking a bank, and there is evidence that he had made preliminary examinations from a neighboring room; that his occupation of such room was accomplished by a criminal breaking and entering would not render the evidence incompetent." See also People v. Spaulding, 309 Ill. 292-304, 141 N. E. 196.

It seems to us that every circumstance which goes to characterize the relationship of the defendant with the victim of this crime on the night in question, may be proved as a fact; and that his attitude, customarily assumed towards others similarly situated, is a fact which throws light on the terms of the relationship with Marie Wick. Was he fulfilling the duties of one in the capacity in which he purported to act, or was he wholly neglecting his obligations and affirmatively contemplating or meditating a criminal course of conduct towards this girl? In the case at bar, if the conduct of the defendant on prior occasions, and in circumstances similar to those attending him on the night in question, were such as to reveal a mind given over to lascivious meditation and to show that, as he occupied his station as night

clerk in the hotel in solitude, he was in effect lying in wait for a victim to whom he could turn for gratification of his lust, we are of the opinion that the evidence of such conduct is admissible. We think the acts embraced within the defendant's admission concerning his relations with the two women in the hotel within a few days of the alleged offense and the admission concerning his feelings towards attractive women patrons of the hotel in general, do reasonably tend to show the possession by him on the night in question of a strong sexual urge towards the victim, such as would be likely to lead one to go to extreme lengths to gratify his desires if not restrained by moral sensibility; and that they characterize the relationship of the defendant with the victim at the time of the crime because of their bearing to show a course of conduct originating in such a relationship, with little regard for the person who happens to be the guest. Suppose that the defendant has been seen in the halls trying to gain access to rooms occupied by other lady guests, the relevancy of such facts would hardly be disputed, notwithstanding the manifestations were towards other persons. The evidence in question is of the same character—differing only in being somewhat farther removed in point of time, but not in place, relationship or circumstance. The jury should be fully informed as to the exact nature of the relationship of the accused to the victim; and for that purpose the state could properly present all the evidence bearing upon it, the same as it could prove all other circumstances bearing upon guilt or innocence.

We do not regard the evidence as admissible to prove, or as tending to prove, that the defendant was morally deficient; that he possessed a criminal disposition generally, or even that he was particularly disposed to commit sexual offenses. We recognize the full force of the rule that excludes evidence of other acts for such purposes. Furthermore, this rule is too firmly embedded in our trial procedure to be any longer open to question, and it is not justly subject to the criticism that it shows too much mercy to a guilty party. On the contrary, the rule finds ample justification in its clear tendency to protect those who may be innocent of the crime charged against consequences that would naturally follow the showing of an unsavory past record (See Wigmore, Ev. 2d ed. § 194). In this respect the Anglo-American differs from the Continental system of evidence. But we do not understand that

this rule precludes the fullest inquiry into the facts entering into the offense charged, and we can see no reason in policy why it should be thus applied. This evidence of former conduct is clearly admissible under the authorities heretofore cited, if it is relevant to prove a fact or circumstance in issue, and, as previously stated, we are of the opinion that it is thus relevant. These crimes of rape and murder were committed in a place which was under the supervision of the defendant, at a time when he was on duty and within the range of ready access to the place. He owed a duty to the deceased of affording protection from harm of all sorts. In what position had he placed himself to discharge that duty? And to what extent did he appreciate the responsibilities of his position? These are, certainly, pertinent inquiries, the answers to which should disclose circumstances of the utmost importance in the deliberations of the jury. We know of no better evidence of his regard for his duties as they existed on the night in question and of the situation in which he had placed himself with respect to this victim than his recent demeanor towards others similarly situated. If this be such as to show that he had virtually set a trap for unsophisticated, as well as for the more experienced, females, why should that fact be barred from the jury? Wherein does such a case differ from a case where one may be shown to have frequented the vicinity of a crime of the same sort as this for some nights or days prior to its commission and to have there evidenced a desire to indulge in the acts that led to a crime which would not have been committed but for that initial desire. Such a case was State v. Lapage, supra.

In that case, the victim of the crime or crimes had been waylaid about nine o'clock in the morning while passing over a certain road on her way to school. She was murdered, the head severed from the body and the body otherwise mutilated. There was no direct evidence that rape had been committed and it seems that the examination of the body, insofar as it was made, did not disclose whether or not such crime had been committed. It was, however, the theory of the state that the victim had been assaulted, raped and murdered. Upon the appeal to the Supreme Court from a judgment of conviction, the admissibility of two classes of evidence was under consideration. Certain witnesses had testified upon the trial to inquiries and remarks made by the accused concerning girls in the neighborhood within

two weeks of the murder, which would tend to show that the accused entertained lascivious thoughts regarding such girls. In addition to this, there was evidence of three witnesses to certain acts of the defendant about two weeks prior to the murder upon a highway some three miles distant from the place of the crime and directed towards a Miss Watson (not the murdered girl) who at the time was accompanied by her mother. The acts testified to clearly amounted to an assault although hands were not laid upon the girl. The girl assaulted was placed in such fear that she was not able later to identify the defendant as her assailant, although her mother, and another who was near the scene of the occurrence, did so identify him. The other evidence received, and which was under discussion upon the appeal, was that of a sister-in-law of the defendant who testified to a rape committed by the latter upon her about four years previously and some two hundred miles distant in Canada. Concerning the evidence of the defendant's actions in the vicinity of the crime, including the assault two weeks prior to the alleged crime, Mr. Chief Justice Cushing said it was "properly admitted. It all tended to show that the prisoner, about the time of the murder, was frequenting that neighborhood with a view to the commission of the crime of rape upon the person of some one of the young females whom he knew to have occasion to pass over that road. The obscene and filthy language he is described as using, in connection with his inquiries about one of the young ladies, tends to show what thoughts were in his mind, and what he was meditating. The testimony of the Watsons and Mercy tends to show, not merely an attempt or design to commit the crime on the person of Miss Watson, but also to show generally, in connection with the other testimony, that he was prowling about that place for the purpose of lying in wait for any person whom he might sacrifice to his base and cruel designs. It furnishes an illustration of the doctrine which I shall attempt to illustrate and maintain. The attempt to commit one offence may be put in evidence when attended with circumstances which give it a logical connection with the fact in issue and not otherwise."

While the court held the evidence concerning the rape in Canada to be inadmissible and its reception to have been prejudicial error requiring a reversal of the judgment, it expressly approved, in the

above language, that which was so closely connected with the crime under investigation as to prove circumstances attending the crime itself. The court said that the questions in regard to the relevancy of the particular items of testimony (page 288) "always depend upon the peculiar circumstances of the case, and must be solved by the application of sound judgment and common sense. It very often happens, as practical men in the profession well known, that facts which in one state of the evidence and one aspect of the case are entirely irrelevant, suddenly, by a slight change in the conditions, become of great importance." Four propositions were advanced and maintained by the court, all of which, so far as our researches have gone, are abundantly supported by the authorities. They are (page 289): (1) It is not permitted to the prosecution to attack the character of the prisoner, unless he first puts that in issue by offering evidence of his good character. (2) It is not permitted to show the defendant's bad character by showing particular acts. (3) It is not permitted to show in the prisoner a tendency or disposition to commit the crime with which he is charged. (4) It is not permitted to give in evidence other crimes of the prisoner, *unless they are so connected by circumstances with the particular crime in issue as that the proof of one fact with the circumstances has some bearing upon the issue on trial other than such as is expressed in the foregoing three propositions.*

This case, in our judgment, affords the closest parallel to the case at bar that is contained in the books and the reasoning in support of the admissibility of the prior acts of the defendant in the neighborhood and within a short while prior to the crime goes far to sustain the ruling of the trial court. Indeed, in some of its aspects, the case at bar furnishes a stronger basis for the ruling, in the closer connection of the parties through a relationship carrying certain definite obligations and which requires close definition, and in the more restricted circle within which the other acts transpired. We are of the opinion that the evidence objected to is legally relevant as tending to prove the actual facts surrounding the crime and the defendant's relation thereto, and that it is admissible in the circumstances shown in this case for that purpose. We are further of the opinion that, if such evidence had no bearing upon any fact in issue in the instant case, and if its use were confined to its tendency to prove criminal disposition or bad character

and as such to furnish a foundation for an inference of guilt in the particular case, it would be inadmissible.

Counsel for the prisoner lay considerable stress in their brief upon the so-called general rule of the law of evidence which excludes proof of other offenses and upon the exceptions to that rule that are so frequently stated in the authorities. The contention is made with great earnestness and ability that the evidence under discussion is not embraced within any of the exceptions and that it is, therefore, inadmissible. The argument in substance is this: That evidence of other acts or offenses is not admissible in a trial charging the defendant with the commission of a particular offense, except (1) to prove motive, (2) intent, (3) to negative mistake or accident, (4) to show plan, scheme or system, or (5) show identity, and that as the evidence under discussion constitutes proof of other offenses, it is inadmissible unless it can be shown to be within one or more of the exceptions. Sufficient has previously been said in this opinion to indicate that in the opinion of the court the admissibility of the evidence in question does not depend upon whether or not it falls within any of the exceptions to the so-called general rule of exclusion and that its admissibility in the instant case depends upon its relevancy to prove facts surrounding the offense. If the evidence be relevant for such purpose, the inquiry as to whether it falls within one or more of the exceptions is beside the question; for, as previously demonstrated, it is not the function of the rule relied upon to exclude any evidence that is legally relevant. We are not required, therefore, to ascertain whether or not it may come within one or the other of such exceptions. It seems to us that these exceptions are only valuable as general guides in determining relevancy in the first instance and if they fail in this it is because of their inadequacy. Their failure to point the way to relevancy leaves that question to be ultimately determined by other considerations.

Counsel stress the doctrine of the leading case of People v. Molineux, 168 N. Y. 264, 62 L.R.A. 193, 61 N. E. 286, in which the rule contended for and the exceptions received elaborate consideration in the Court of Appeals of New York. The appellant had been convicted of the murder of Catherine Adams through the instrumentality of poison claimed to have been sent through the mail, to have been received by

one Cornish and administered by him to the deceased without knowledge of the poisonous character. It was shown on the trial that another had likewise been poisoned and died as the result and that the poison in each instance was rare and similar and, hence, indicative of a common origin. The defendant was shown to have had the requisite knowledge of chemistry to enable him to concoct the poison. Premising the inadmissibility, under the general rule, of the evidence to establish the killing of the other person, the majority of the court, by the process of elimination, held that such evidence was not admissible within any of the exceptions. But Chief Justice Parker, in an able opinion, dissented from both the method of reasoning employed to demonstrate inadmissibility and from the result reached under that method, holding that the evidence should have been admitted, even under the exceptions, to establish identity. The case is so far different from the case at bar in its facts that it affords but little assistance as a precedent on the question in hand.

Counsel assert that the apparent initial motive prompting the conduct of the perpetrator of the crime was the desire to commit forcible rape and that the obvious motive for the crime charged was concealment of the rape. From this the argument is made that these prior acts are inadmissible because they do not tend to prove that this defendant had any such motive. They also contend that there is no common peculiarity in the manner of the commission of the prior acts and of the act in question, such as would give the evidence of the prior acts any bearing on the question of identity. Having determined that the evidence under discussion is relevant as tending to prove the circumstances in which the crime was committed and as shedding light on the situation as it existed in the hotel at the time, these arguments do not require further attention. However, we think counsel are mistaken in assuming that the initial motive was the desire for sexual relations through force. The initial motive was simply a desire for sexual intercourse. The argument seems to assume that the defendant must be shown to have had a motive strong enough to lead him to rape the accused, or stated in another manner, that unless the claimed motive be shown to have been proportionate to the heinousness of the offense, the motive is not shown at all so far as the accused is concerned.

Wharton says on this subject:

(1 Whart. Crim. Law, 11th ed. § 158). "When a powerful passion seeks gratification, it is no extenuation that the act is illogical; for when passion is once allowed to operate, reason loosens its restraints, and hence when there is a general wrongful intent, no specific commensurate motive need be shown."

Without passing on the question as to whether or not the evidence offered might be properly received to prove that the defendant was actuated by the motive which obviously led to the crime in question, we are of the opinion that it would not be a prerequisite to its reception for such purpose that it should show a disposition to use force. So far as the argument directed to the inadmissibility of the evidence on the question of identity is concerned, we do not hold it to be admissible for this sole purpose. Whatever bearing it has on the question of identity is derived from its connection with the facts generally in issue; as such it bears on identity only in its broad sense, the same as the other evidence. Hence, it is not necessary that there should be any peculiarity common to the other acts and to those under investigation.

We have not overlooked counsel's contentions concerning the testimony of the girl who visited the hotel some eight months prior to the crime; nor the exceptions to the manner and form of the questions put to the defendant when he was interviewed in the jail, which questions were read to the jury. The evidence of the young lady guest was simply to the effect that when she was taken to her room by the defendant, in circumstances similar to those in which the victim of this crime was accompanied to her room, the defendant displayed a lascivious bent of mind through proposals and suggestive remarks made to the witness. Since this court regards the attitude assumed by the defendant towards unaccompanied female guests in the hotel in general to be a legitimate subject of inquiry for the purpose of determining whether or not he was prone to respect his obligations to the guests and as throwing light upon his attitude towards the victim of this crime on the night in question, we think this evidence can not be said to be so remote in time as to have no legitimate bearing.

As to the form of the questions, it is true they were extremely obscene, but a reading of the entire interview discloses that the questions took the form suggested by the defendant's own vocabulary. If, as

a result of this unfortunate vocabulary, the jury gained the impression that the defendant was abnormal in matters relating to sex, it is his own misfortune and he can not complain.

*Defendant's Fifth Contention.* This is more a specification of error by defendant than a serious contention since defendant has not devoted in his brief any attention to its consideration. Nevertheless, since the ruling of the trial court affects fundamentally the state's case and presents important legal questions, this court has given serious consideration to the specification. It predicates error on the ruling of the trial court which permitted the state, over the objection of the defendant, to introduce into evidence exhibits 55 to 73 inclusive. These exhibits are specimens of the handwriting of the witness Brown and identified as such by Brown when called as a state's witness.

Our statute lays down no rule for guidance in the matter. There is more or less confusion in the American authorities touching the question of whether or not irrelevant papers may be admitted in evidence for the purpose of furnishing a standard of comparison for a writing which is material and in dispute in the controversy. See Smith v. Hanson, 18 L.R.A.(N.S.) 521 and note (34 Utah, 171, 96 Pac. 1087); University of Illinois v. Spalding, 62 L.R.A. 817 and note (71 N. H. 173, 51 Atl. 731); Mississippi Lumber & Coal Co. v. Kelly, 19 S. D. 577, 104 N. W. 265, 9 Ann. Cas. 449.

The trend of modern authority is to very liberally enlarge and extend the rules with reference to proof and comparison of handwriting. The old common law rule was exceedingly narrow and technical. The reasons that were variously urged in support of that rule may have been well grounded when the rule was first established, but conditions generally have so changed that those reasons no longer apply with any particular force. Nowadays it is only the exceptional individual, whether witness or juror, who cannot both read and write with a greater or less degree of skill. The study of handwriting has become a scientific matter and with modern theories as to individual characteristics as expressed in handwriting and the scientific means for measurement and demonstration that have been devised, the status of handwriting evidence has wholly changed. That being the case, the rules of evidence with respect to handwriting have had to be enlarged accordingly. It is another case of the growth and progress of the law to

meet modern requirements.  See note to University of Illinois v. Spalding, 62 L.R.A. 817.  In the case of Cochrane v. National Elevator Co. 20 N. D. 169, 127 N. W. 725, this Court, in speaking of the matter there under consideration touching the question, said:

"The rule which we deem the more sound and better rule and the one which we shall adopt is that . . . irrelevant papers are not admissible in evidence for the sole purpose of furnishing a standard of comparison but that to this rule exceptions are made in those cases . . . where the papers offered are conceded by the opposite party to be genuine, or are such as he is estopped to deny, *or where for other reasons no collateral issues can be raised by their introduction.*"

The rule having been thus established, the question raised by appellant's specifications will have to be measured by its terms.  The exhibits objected to are wholly irrelevant.  The state called the witness Brown to testify that they were his handwriting.  Concededly they were offered only for the purpose of establishing a standard for comparison.  The defense objects to their introduction.  That they are not genuine is not specifically urged as a ground for rejection.  Practically, there is no room for denial of their genuineness.  The rule stated in the Cochrane Case, supra, is flatly that irrelevant papers are not admissible for the purpose of furnishing a standard for comparison, but this rule is modified by stating the exception thereto.  That being the case, do the writings here offered come within any of those stated exceptions?  The first exception stated is where the writings offered are conceded by the opposite party to be genuine.  Here the defendant by making objection surely negatives any such concession.  Such concession must be the concession of the opponent and not of the witness.  See Wigmore, Ev. § 2021.  Neither is there room to urge that an estoppel can be raised as against his denying their genuineness.  So plainly the writings here offered and objected to come under neither the first nor the second exception.  That being the case, if they are admissible at all, it must be because of the third exception as stated to the general rule, and that is, "where for other reasons no collateral issues can be raised by their introduction."

In view of what has heretofore been said regarding the modern tendency to enlarge and extend the rules with reference to the matter under consideration, we think that the exhibits in question were admissible

under the terms of this third exception. It seems to us that the question of genuineness of the proposed standards is a preliminary question to be determined by the trial court, Wigmore, Ev. § 2020, just as the trial court passes upon the question of competency where a child of tender years is called as a witness, or where a question as to the insanity of a witness is raised, or where objection is made to the admission of a confession on the ground that it was involuntary or where a dying declaration is offered, or where a question of privilege is raised. And, if such evidence is offered and the trial court is thoroughly satisfied, is morally certain, that the proffered writings are genuine, and that it is proper so to do, they may be received for purposes of comparison. That is, in the application of the third exception to the general rule, large discretion must be reposed in the trial court; and except in cases of abuse, the exercise of such discretion should not be disturbed. On the record in this particular case, the evidence objected to could have no tendency, reasonably, to complicate the issues, and there was no error in this respect on the part of the trial court.

*Defendant's Sixth Contention.* Under this head there may be grouped various specifications of error made by defendant and not deemed well taken by this court. Thus, the trial court did not err in sustaining the objection of the state to the question propounded to Sheriff Kraemer, while a witness, concerning whether defendant in his answers to questions by the authorities usually answered them, yes or no. Upon the record this called for a conclusion of the witness. So the court did not err in receiving testimony of the witness Knight, upon rebuttal, to the effect that Brown had stated to him that he left the Prescott hotel during the night of the crime about 12 :30 A. M. since this was proper rebuttal testimony though of slight probative value in view of Brown's testimony as witness for the defendant.

Accordingly, upon full consideration of the entire record and defendant's specifications of error, we are of the opinion that the defendant was afforded a fair trial without the commission of error by the trial court prejudicial to the defendant and that the judgment and order of the trial court must be affirmed. It is so ordered.

BRONSON, Ch. J., and CHRISTIANSON and BIRDZELL, JJ., and BURR, Dist. J., concur.

Mr. Justice JOHNSON, being disqualified, did not participate; Honorable A. G. BURR, Judge of the Second Judicial District sitting in his stead.

NUESSLE, J., dissenting. I am unable to concur in the opinion of the majority of the court in this case. My dissent is based upon and limited to those portions of the opinion covered by paragraphs 4, 7 and 8 of the syllabus. I wholly agree with the principles of law invoked in disposing of the matters therein dealt with, but I disagree in the application of those principles to the facts in the case. I think that the evidence objected to was improperly admitted; that its admission cannot be justified by any logical application of those rules of evidence which the majority opinion recognizes and seeks to apply. The evidence complained of was prejudicial in the extreme, and the judgment should be reversed and a new trial ordered.

## On petition for rehearing.

PER CURIAM. In a petition for rehearing, counsel insist that one of their principal contentions is not answered in the opinion of the court. In the brief originally filed, there were detailed what are denominated "elements of fact," constituting essential elements in the chain of circumstantial evidence, from which it was contended that the inference of innocence was more logical than the inference of guilt. The theory or theories of the state as to the defendant's connection with the crime were considered, and argument was advanced that under the evidence supporting all such theories there existed a reasonable hypothesis wholly consistent with the innocence of the defendant, and from this it was argued that the circumstantial evidence did not exclude every reasonable hypothesis of the defendant's innocence and that, therefore, as a matter of law, it must be held that the evidence is insufficient to support the verdict. It is said in the petition for rehearing "the question is not whether the proof is consistent with guilt. The point is, what facts are there in this record sufficient to prove guilt which are absolutely inconsistent with any reasonable hypothesis of innocence?" We are of the opinion that counsel confuses the functions of the court and the jury in the trial of criminal cases. These func-

tions are not affected by the character of the evidence. There is the question of the legal sufficiency of the evidence in all cases. That is, there is the question whether there is any substantial evidence in support of the verdict. This question is one of law for the determination of the court; but the weight of the evidence is for the jury whether the evidence is direct or circumstantial. And where there is evidence circumstantial in its nature, from which reasonable men in the exercise of reason and judgment may draw different conclusions then the court is not at liberty to substitute its own judgment for that of the jury as to which conclusion, or hypothesis, is the more reasonable. In other words, it is the function of the jury to determine the facts. The evidence is their guide, and the question of the sufficiency of the evidence in a criminal case is the same as in a civil case, except that in the former its sufficiency must be tested in the light of the greater burden which is cast upon the state to prove guilt beyond a reasonable doubt rather than by a preponderance of the evidence merely.

The fact that the evidence is circumstantial in no way alters the respective functions of the court and the jury. If the court feels that the evidence reasonably might convince the jurors to a moral certainty, the case should be submitted for a verdict, and the verdict should be regarded as conclusive on the facts. When the evidence is circumstantial and, in the mind of the court, meets this requirement of legal sufficiency the jury must judge whether or not the circumstances adduced upon the trial are such as to exclude every reasonable hypothesis of innocence and whether or not the state has sustained the burden of proving guilt to a moral certainty or beyond a reasonable doubt. In this case, the trial court amply instructed the jury, both as to the burden assumed by the state, and as to the character of circumstantial evidence, as well as to the legal requirement that it should be inconsistent with any other rational conclusion than that of guilt. We are satisfied on this record that the verdict finds ample support in the evidence in that the circumstances disclosed are such that, in our opinion, reasonable men may be satisfied therefrom to a moral certainty of the defendant's guilt.

The petition for rehearing is denied.

BRONSON, Ch. J., and BIRDZELL and CHRISTIANSON, JJ., and BURR, Dist. J., concur.