[Cr. File No. 121.]

STATE OF NORTH DAKOTA, Respondent, v. ARTHUR A. BERENSON, Appellant.

(260 N. W. 256.)

Opinion filed April 3, 1935.

■■■■■■■■■■■■

*P. O. Sathre,* Attorney General, *A. R. Bergesen,* State's Attorney, and *Roy K. Redetzke,* Assistant State's Attorney, for respondent.

*Shure & Murphy,* and *Aaron Aaronson* (on brief), for appellant.

NUESSLE, J. The defendant was tried and convicted on a charge of engaging in the liquor traffic contrary to the provisions of § 10,-145b3, Supplement to the 1913 Compiled Laws. He made a motion for a new trial. This was denied. Judgment was entered on the verdict. The defendant thereupon perfected the instant appeal from the order denying his motion for a new trial and from the judgment.

The information on which the defendant was tried charges that on the 14th day of March, 1933, he committed the crime of engaging in the liquor traffic, second offense, by having intoxicating liquor in his possession and under his control.

In support of his appeal the defendant urges, as he did on his motion for a new trial, that the evidence is insufficient to sustain the verdict, in that there is no competent evidence that the defendant possessed intoxicating liquor as charged in the information and that the only evidence tending to connect him with the commission of the offense charged is the testimony of accomplices who were not corroborated by any independent evidence; that the court erred with respect to the admission of evidence, both by overruling defendant's objection thereto and by denying his motions to strike the same from the record; that the court erred both in the giving of certain challenged instructions and by failing to instruct on material matters.

It is conceded that the proofs are sufficient to establish a former conviction.

The record further discloses that the defendant, Arthur A. Berenson, lived in Fargo. He was commonly known there as Chief Berenson.

Shortly prior to the 14th of March, 1933, he, together with two strangers, went to the office of a transfer company in that city. One of the three stated that the strangers were expecting a car load of roofing cement and inquired what the charge would be for unloading the same. On the 14th of March the three again went to the transfer company's office. The defendant introduced and identified the strangers. They stated that their roofing cement had arrived and they wished to have the same unloaded. Thereupon the transfer company sent two of its vans to the railroad yards. The car designated by the strangers was opened. The vans were hurriedly loaded with steel drums containing some liquid, one van with 29 drums, the other with 36. The drums were black with yellow ends. They were uniform in size and with a capacity of between 50 and 55 gallons.

In the meantime someone had notified the sheriff that there was a suspicious shipment in the yards. He with some of his deputies drove there. As they approached the car in which the alleged roofing cement had been shipped they saw a Chevrolet truck leaving it. They gave chase and finally caught it. The driver escaped and was not identified. This truck was loaded with 18 drums similar to those above described. They took the truck and its contents into their possession. The officers learned about the two vans belonging to the transfer company. They made inquiry as to whether these vans had gone. They traced them and found that the one containing 29 drums was driven to the Stenberg farm north of Fargo, the other to the Schmidt farm some miles west of Fargo. The officers first went to the Stenberg farm. They found the 29 drums locked in the Stenberg barn. They took these also into their possession. They then went to the Schmidt farm. There they found the 36 drums that had been hauled in the second van. The liquid in all of these drums was alcohol. On the Schmidt farm they also found tanks, vats, strainers, hose, and other equipment suitable for use in the cutting and bottling of alcohol. The drums had been placed in the Schmidt basement. In the same basement they discovered, along with the equipment above described, numerous five gallon jugs of distilled water, more than 100 bottles filled with alcohol or whiskey, and some gallon tin containers filled with alcohol and many cartons of empty containers.

Mr. and Mrs. Stenberg, the occupants of the Stenberg farm, and the

Schmidts, father and son, who occupied the Schmidt farm, were arrested and held for trial on a charge of violating the prohibition law. On the trial in the instant case all of these persons were called as witnesses for the state. It appeared from this testimony that in December, prior to the seizure in the instant case, one "Pete" arranged with Stenberg to store alcohol at his place. He also made a similar arrangement with the Schmidts. He agreed to pay rental for the use of their premises and did make some such payment. Thereafter numerous truck loads of alcohol were delivered at these places. This alcohol was then cut—that is diluted with distilled water and otherwise treated, put into bottles and tin containers and hauled away. The alcohol was delivered, treated, put into such containers and taken away by various persons who, at one time or another, singly or jointly, came to these farms. These persons otherwise shrouded in anonymity were called "Pete," "Carl," "Swede," and "Fat." The distilled water and the equipment for cutting was also delivered by one or another of these men. It appears that a considerable business of this character was done. The Stenbergs and the Schmidts knew what was being done and assisted more or less in the operation. The defendant never at any time, however, was at either of the farms while the alcohol was being treated. Nor did he ever accompany any of the trucks or vans when the same or the equipment and other supplies were hauled there or taken away. The state relies largely upon circumstantial evidence to establish his connection with the transactions in question.

Mrs. Stenberg testified that she was greatly perturbed by the seizure of the alcohol on the Stenberg farm on March 14. So much so that she was unable to sleep that night. Her husband was away. She and her small son sat up. Sometime after midnight someone came to the farmhouse, rapped on the door and demanded admission. She inquired who was there and was told it was "Pete." Thereupon she opened the door and admitted him and another man whom she did not then know. At the trial she identified this man as the defendant. The defendant wanted to know all about what had happened that day. Her version of the ensuing conversation is as follows: "Well, he told me if it ever came up to court, not to recognize any of the men that were placed up there. He said: for instance, if Pete is called up there, say, no, he is not that man." He further told her that if Carl or the "Chief" were

brought up that she should refuse to identify them also. On cross-examination her testimony was "He asked if we had had a raid there and I said: yes. He asked if it had been taken, and I said: yes. He said— and then I said, well, I thought it was a swell thing to get mixed up in, I said. And he said there wouldn't be nothing to it; he said if I wouldn't identify anybody that was brought up there, everything would be all right."

Schmidt testified that he was told to call phone No. 5456 in Fargo and arrangements would be made to him to pay the rent that was due. So he went to the Fargo Garage and called this number and in response to this call Carl came. Carl took him to an office over the garage. Witness said he wanted his rent. Carl called someone over the telephone, addressing the person with whom he talked as the "Chief." Shortly thereafter the defendant came into the office. Carl then said "that they had the stuff there at my place and I got a little money coming for the rent." I (Schmidt) told him $15. Thereupon defendant said witness would get it if he had it coming. The defendant then left and at once Pete came and gave the witness the money. At a later date he saw the defendant at another place and asked for more money for rent and defendant then paid him $15 saying it was all he had. He refused to make any payment thereafter.

When the alcohol was unloaded from the railroad car on the 14th of March one of the vans drove to the transfer company's office and awaited directions as to where the load should be taken. Defendant thereafter drove up to the office in an automobile accompanied by an unidentified man. The man got out, got on the van with the driver, and directed the load to its destination on the Stenberg farm. Mrs. Stenberg testified that this man was "Swede." After the van was unloaded he accompanied it part way back to Fargo. On the way back a car drove up to the van from behind, stopped, the man got out and into the car and drove away.

Shortly prior to March 14 the defendant arranged with the transfer company to procure and store cartons of tin containers, tanks, vats, and other material identical in appearance with the containers and equipment seized on the Schmidt farm. Subsequently the tanks, vats, and some of the cartons of containers, as well as jars of distilled water, were, at the defendant's direction, loaded on a truck, and the defend-

ant sent his own driver, one "Fat" Gillerstein to drive the load to its destination. This truck was marked with the transfer company's name and was numbered 24. The Schmidts testified the cutting equipment and some of the containers were delivered by a man called "Fat" who used a truck numbered 24 and marked with the transfer company's name. The Fargo Detroit Ice Company sells distilled spring water. Someone talking over phone No. 5456, ordered 200 gallons and shortly before the 14th of March another order of 500 gallons was placed to be delivered to the transfer company's warehouse. The ice company required payment on delivery. The defendant left $210, in five and ten dollar bills, the amount required to pay for one consignment of distilled water, with the transfer company, with directions to pay it to the ice company when the order was delivered. The ice company was notified accordingly. Delivery was made and payment received for it. The distilled water found in the jugs on the Schmidt farm was in containers identical with that used by the ice company and was marked with their name and brand. All of the water that was left with the transfer company was not removed. Neither were all of the tin containers. After the 14th of March the defendant directed another transfer company to get the distilled water that remained with the first company and the cartons filled with tin containers. This was done. Thereafter the second transfer company was directed by the defendant to return this distilled water to the ice company and receive the refund for it, which had been arranged for by someone over the telephone. This delivery was made. The refund was paid to the transfer company and the defendant directed the transfer company to apply the amount thus received on his account with them. This was done. In these various transactions different names were used for those responsible for and directing the transactions, and charges for the service were made in one name or another. But the evidence is sufficient to warrant a finding that defendant was in fact the mover and director in all of them.

The transfer company's bookkeeper testified that on the night of March 14 after the alcohol on the Stenberg farm had been seized by the officers he saw and had a conversation with the defendant. The purport of the conversation was as follows: "Well, he stated, things were kind of hot. Might be having a little trouble. Wondering if the drivers would say anything. He said he didn't think the "T-bone"

(one of the drivers) would, but he didn't know about the others." The bookkeeper also testified charges for various of these items were made on the transfer company's books against the defendant and in the defendant's name; that after the officers seized the alcohol on March 14 defendant inquired how the charges were made and when he learned they were made in his name insisted they be changed and entered against someone else.

Considering it as a whole, if the evidence received over the defendant's objections was admissible, the record is sufficient to sustain a finding that the defendant either actually or constructively was in possession of the alcohol which was seized by the officers on March 14.

The state predicates its case against the defendant on his possession, actual or constructive, of the alcohol which was shipped in as roofing cement and unloaded from the box car on March 14.

The defendant insists that there is no competent testimony in the record on which a finding that this alcohol was in the possession of the defendant can be based; that a great mass of testimony having to do with other violations of the prohibitory law prior to March 14 was erroneously admitted over his objection; that this testimony related to independent and distinct collateral offenses committed by various other persons with whom the defendant had no connection; that in the attempt to connect the defendant with these various transactions the State relied upon the testimony of witnesses who, if the defendant had any connection with those transactions, were accomplices; that even if such testimony were admissible to establish the offense with which the defendant was charged, there was no independent corroboration thereof; and that not only did the court err in receiving this testimony but also in not ruling that it was insufficient because of lack of corroboration.

Of course no rule is better established than that evidence of independent collateral crimes is not admissible merely to prove the depravity of a defendant or his criminal disposition. State v. Gummer, 51 N. D. 445, 200 N. W. 20, and cases cited. But if evidence otherwise relevant is offered the fact that incidentally it tends to establish collateral matters or to prove collateral crimes does not render it inadmissible. State v. Heaton, 56 N. D. 357, 217 N. W. 531; State v. Gummer, supra. As we said in the Heaton case:

"Largely considered, the rules of evidence are practical and logical. Where any matter of fact is in issue in a suit, any other fact is relevant which reasonably and naturally tends to prove or disprove the matter of fact thus in issue. So it is admissible in evidence unless subject to some rule of exclusion. There are rules, sometimes practical, and sometimes arbitrary, which render evidence otherwise logically probative, inadmissible. But, in the main, relevancy is the test of admissibility. Wigmore, Ev. 2d ed. §§ 9–23; 22 C. J. p. 158, et seq. As is said in the case of Plumb v. Curtis, 66 Conn. 154, 33 A. 998: 'Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. Evidence is admitted, not because it is shown to be competent, but because it is not shown to be incompetent. No precise and universal test of relevancy is furnished by the law. The question must be determined in each case according to the teachings of reason and judicial experience.' Thayer, Ev. 2, 3: 'If the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury.' Home Ins. Co. v. Weide, 11 Wall. 438, 440, 20 L. ed. 197, 198. The question as to its admission or rejection addresses itself to the court as one to be answered with a view to practical, rather than theoretical, considerations. The guiding principle is well stated in Stephen's Digest of the Law of Evidence (p. 36, chap. 1): 'The word "relevant" means that any two facts to which it is applied are so related to each other that according to the common course of events, one, either taken by itself or in connection with other facts, proves or renders probable the past, present, or future existence or non-existence of the other.' "

Here the state contends that the defendant and his confederates were engaged in the business of cutting and retailing alcohol which they purchased in wholesale quantities; that this business had been carried on for some time; that arrangements had been made by the agents or associates of the defendant to provide a place where such operations could be carried on; that supplies and appliances were provided by the defendant or by those under his direction to enable this business to be done; that in conformity with this practice the alcohol which was seized on March 14 by the officers was shipped to Fargo and taken into the possession of the defendant through his agents and associates; that

though he personally did not have this alcohol in this possession it was constructively in his possession by reason of the fact that it was delivered at his order at places provided by his direction in accordance with the general plan and practice adopted and followed in carrying on the business; and that the evidence which was thus offered tended to establish these material matters.

It seems to us that the State's position in this respect is well grounded. All of the evidence thus offered tended to prove that there was a well organized business in procuring, cutting, and disposing of alcohol; that the defendant was intimately associated with those engaged in the business and one of the directing forces behind it; that it was the practice and plan in carrying on the business to receive and dispose of large shipments of alcohol, contained as the alcohol involved in this prosecution was contained. The shipment here involved was a large one. It consisted of more than 4,000 gallons of a relatively high-priced commodity. All of this evidence tended to establish a plan or scheme under which this alcohol was to be treated and disposed of. It tended to prove in connection with the other evidence that the defendant was interested in the same way in this shipment as he had been in other consignments of alcohol. Defendant says that this evidence was incompetent and that it was peculiarly prejudicial to him under the circumstances. But, as shown in the Heaton case, the fact that incidentally it involved and tended to prove the commission of other and independent offenses, did not render the evidence incompetent. And merely because it was prejudicial was no ground for rejecting it. We hold, therefore, that there was no error in the ruling of the trial court in this behalf.

Now with respect to the matter of accomplices. It appears that the Stenbergs and the Schmidts were arrested on account of having in their possession portions of the car load of alcohol in question. This was the alcohol the defendant is charged with having had. The theory of the State was that their possession was the defendant's possession. Therefore, there is ground for the defendant's contention that they were accomplices. If so, their uncorroborated testimony is not sufficient to establish a case against him. See § 10,841, Comp. Laws 1913. But there is also testimony of various disinterested witnesses who cannot be said to have been accomplices, which is ample in the way of corroboration. The facts hereinbefore stated speak for themselves

in this respect. The testimony of the transfer company's bookkeeper, the drivers of the vans, the officers of the ice company, of the manager of the second transfer company, and of various other witnesses—all of these tend to corroborate the testimony of the witnesses who may be called accomplices and to establish by independent evidence the defendant's complicity in the offense that is charged against him.

The defendant further complains that the court erred in his instructions to the jury. That in this respect the court was guilty of errors both of commission and of omission. The defendant was charged with engaging in the liquor traffic by having alcohol in his possession. This charge was laid under § 10,145b3 of the 1925 Supplement, which provides: "Any person who shall within this state, manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor, shall be guilty of the crime of engaging in the liquor traffic." The court in charging the jury read this statute and advised the jury that the offense might be committed in any one of the ways specified therein. The defendant says that this was prejudicial error, in that in this particular case the evidence tended to establish violations of the statute in various other manners than by possession, and therefore the effect of the instruction was to lead the jury to believe that the defendant might be found guilty if the State had established a violation of the statute in any one of the several ways. We think that viewing the whole instruction the charge is not subject to this challenge. In the concluding portion of the charge the court said: "The defendant is charged here with possessing intoxicating liquor and before you can convict you must be satisfied beyond a reasonable doubt that the defendant had in his possession or possessed intoxicating liquor at the time and place charged." So though the court read the statute in question and commented thereon as hereinbefore stated, nevertheless the last quoted portion of the instruction must have disabused the minds of the jury of any impression, if any they had, that they might return a verdict of guilty on account of a finding of violation in any other manner than by possession. The charge must be considered as a whole. State v. Kerns, 50 N. D. 927, 198 N. W. 698; State v. Bowe, 57 N. D. 89, 220 N. W. 843. Thus considered it is clear that the jury could not have believed it was possible to return a verdict of guilty unless they found beyond a reasonable doubt that the defendant possessed intoxicating liquor at

the time and place and in the manner as charged in the information.

The defendant further contends that the court erred by failing to instruct the jury as to the law of accomplices, in that he did not define accomplices and did not charge that a verdict of guilty could not be returned on the uncorroborated evidence of accomplices. It is sufficient to say that there was no request for such an instruction, and in the absence of a request the defendant cannot complain because of failure to instruct respecting the matter. See State v. Glass, 29 N. D. 620, 151 N. W. 229, and cases there cited; State v. Bowe, supra.

The judgment must be and it is affirmed.

BURKE, Ch. J., and CHRISTIANSON and BURR, JJ., concur.

MORRIS, J. did not participate.